551 So.2d 107 (1989)
HINDS COUNTY BOARD OF SUPERVISORS, Roger Stewart, George Smith, Hershel Wilbourn, Walter Dennis, Bennie Thompson and Frank Bryan
v.
COMMON CAUSE OF MISSISSIPPI, Roberta Madden, Rims Barber, Barbara Powell, John Guest and Mississippi Publishers' Corporation.
No. 58177.
Supreme Court of Mississippi.
June 28, 1989.
Rehearing Denied November 15, 1989.
*109 John L. Walker, Nausead Stewart, Walker & Walker, Frank T. Moore, Jr., John Robert White, Wells, Moore, Simmons, Stubblefield & Neld, Michael S. Allred, Edwin Y. Hannan, Satterfield & Allred, Jackson, for appellants.
Thomas W. Tardy, III, Leonard D. Van Slyke, Jr., Terryl K. Rushing, Thomas, Price, Alston, Jones & Davis, Charles H. Ramberg, Elizabeth Gilchrist, Jackson, for appellees.
Before HAWKINS, P.J., and ROBERTSON and SULLIVAN, JJ.
HAWKINS, Presiding Justice, for the Court:
This case involves the Hinds County Board of Supervisors which was under a chancery court injunction to comply with the Open Meetings Act, Miss. Code Ann. § 25-41-1, et seq., Ch. 481, Laws 1975, and the record reveals well over fifty violations of the Act and the Consent Decree placing the Board under the injunction. Two of the Board members agreed that the Consent Decree had been violated, and contended they endeavored to persuade the other members to comply with the Decree. The position of the remaining members of the Board is that the violations were at most technical, and in reality peccadillos. For the reasons we will set forth, we attach more significance and importance to the technical requirements of the Act than these Board members.
We reverse and render the imposition of criminal sentences when the chancellor only found the defendants guilty of civil *110 contempt; we reverse and render the chancellor's finding that Supervisors Bennie Thompson and Frank J. Bryan, Jr., were guilty of civil contempt; we reverse the chancellor's vacating the Consent Decree and reinstate it; and reverse the chancellor's disallowance of attorney's fees.
Some acquaintance with the philosophy behind, as well as the technical requirements of the Act, is requisite to placing the Board's transgressions in proper perspective. Thus, we preface our opinion with some law.

PHILOSOPHY AND SPIRIT OF ACT
In Mayor & Aldermen of Vicksburg v. Vicksburg Printing & Pub., 434 So.2d 1333, 1336 (Miss. 1983), we stated:
Openness in government is the public policy of this state. It is conducive to good government, and heroic deeds.
* * * * * *
However inconvenient openness may be to some, it is the legislatively decreed public policy of this state.
In Board of Trustees, et al. v. Miss. Publishers Corp., 478 So.2d 269 (Miss. 1985), we reiterated our holding in Mayor & Aldermen of Vicksburg, supra, and stated, "The Open Meetings Act was enacted for the benefit of the public and is to be construed liberally in favor of the public." Id. at 276.
The philosophy of the Open Meetings Act is that all deliberations, decisions and business of all governmental boards and commissions, unless specifically excluded by statute, shall be open to the public. Miss. Code Ann. § 25-41-1.
No doubt there are occasions when board members would speak more frankly on some matter if only the board members were present, and no doubt there are instances in which a board member would personally prefer to speak only to his colleagues. Of far greater importance, however, is that all public business be open to the public. Every member of every public board and commission in this state should always bear in mind that the spirit of the Act is that a citizen spectator, including any representative of the press, has just as much right to attend the meeting and see and hear everything that is going on as has any member of the board or commission. Miss. Code Ann. § 25-41-1; Mayor & Aldermen of Vicksburg, supra; Board of Trustees v. Miss. Publishers Corp., supra.
A citizen spectator or news reporter is not a participant. He has no right to intrude or interfere in any manner with the discussion, deliberation or decision-making process. Miss. Code Ann. § 25-41-9; Wood v. Marston, 442 So.2d 934, 941 (Fla. 1983). But he does have a right enforceable at law to be there and see and hear everything.
There is no question but that the Hinds County Board of Supervisors was and is a "public body" under the Act, Miss. Code Ann. § 25-41-3, and required to hold its meetings public and open. Miss. Code Ann. § 25-41-5.

THE TECHNICAL REQUIREMENTS
Most of the violations in this case involved the Board going into executive session without complying with Miss. Code Ann. § 25-41-7, set forth in full in Appendix A. This section has mandatory requirements as to all executive sessions, which may be summarized as follows:
1. The meeting must begin as an Open Meeting. [Miss. Code Ann. § 25-41-7(1)]
2. A member must make motion in Open Meeting for the meeting to be closed to determine whether or not the Board should declare an executive session. The statute does not require a second to this motion, but the vote on this motion is taken in Open Meeting. If a majority votes to close the meeting to make a determination on the question of an executive session, the meeting is closed for this purpose. [Miss. Code Ann. § 25-41-7(2)]
3. No other business during this closed interim shall be considered until a vote has been taken on whether or not to declare an executive session. [Miss. Code Ann. § 25-41-7(2)] In order to go into executive session, a majority of three-fifths of those present must vote *111 in favor of it. [Miss. Code Ann. § 25-41-7(1)]
4. The Board must then state in Open Meeting the reason for going into executive session, and this reason and total vote thereon must thereafter be recorded on the minutes of the meeting. [Miss. Code Ann. § 25-41-7(3), (5)]
5. The vote to go into executive session is applicable only to that particular meeting on that particular day. [Miss. Code Ann. § 25-41-7(6)]
For illustration, the board meeting must begin as an open meeting, Miss. Code Ann. § 25-41-7(1), following which if some matter is either brought up or about to be discussed which any member believes should be discussed in executive session, he must make a motion to close the meeting to determine if the board should go into executive session. The member making the motion is not required at that time to disclose the reason, nor is there any need for a second, but there must be a majority vote in favor of closing the meeting to make this determination. Miss. Code Ann. § 25-41-7(2).
Upon majority vote the meeting is closed. The board then is permitted to discuss whether or not to go into executive session, but no other business than this particular matter may then be discussed. Miss. Code Ann. § 25-41-7(2). If a three-fifths majority of the board votes to go into executive session, the chairman must then re-open the meeting and announce publicly that the board is going into executive session, and give the reason for doing so. Miss. Code Ann. § 25-41-7(3), (5). The reason given, of course, must be meaningful. It must be more than some generalized term which in reality tells the public nothing. To simply say, "personnel matters," or "litigation," tells nothing. The reason stated must be of sufficient specificity to inform those present that there is in reality a specific, discrete matter or area which the board had determined should be discussed in executive session.
The board may then go into executive session to discuss this one matter and, when concluded, must re-open the meeting. No other matter may be discussed at the executive session than the announced subject.
This entire procedure and the vote on each stage must thereafter be recorded on the minutes.
While it is not for this Court or any board to question the wisdom of these requirements, there are very good reasons for each of them.
When a member of the board believes the board needs to go into executive session, he may very well not know the precise reason or how it should be stated, or in fact that the board will agree with him, or the board attorney may advise that the matter is not a proper subject for executive session. Therefore, he is not required to give any reason for asking that the meeting be temporarily closed to determine the need for an executive session.
In a short, temporarily closed meeting, however, the board can determine the precise matter to be discussed and considered, and whether or not an executive session is appropriate. If by a three-fifths vote it is decided to go into executive session, the chairman must re-open the meeting and announce publicly that the board is going into executive session, and state the reason for doing so. The chairman then knows precisely why the board is going into executive session. He must publicly state the reason with sufficient specificity for the audience to know in fact that there is an actual, specific matter which is to be discussed and considered in executive session.
When a board chairman tells a citizen he may not hear the board discuss certain business, he is taking liberties with the rights of that citizen, and the reason given for this interference must be genuine and meaningful, and one the citizen can understand. To permit generalized fluff would frustrate the very purpose of the Act.[1]
*112 This Court is cognizant that when there is indeed a valid, legitimate reason to go into executive session it may deal with some sensitive matters such as a person's character, or some investigation which for the time being should not be publicly discussed. The board should not be required to give the reason for going into executive session in such detail as to defeat the very purpose of going into executive session. At the same time, it must, as above noted, disclose enough so that the audience can know in fact that there is some specific area of matter that the board has wisely concluded should, for the time being, be discussed in private.
Analogous is a witness asked a question which he believes will tend to incriminate him, and he desires to claim the privilege of the 5th Amendment. He is required to give the court sufficient information for the court to determine in fact that answering the question would tend to incriminate the witness. Mississippi State Bar v. Attorney L, 511 So.2d 119, 123 (Miss. 1987).
The purpose of Miss. Code Ann. § 25-41-7 is to discourage private meetings of public bodies, and closed session discussions and consideration of public business. The technical requirements of the Act not only enlighten the public that there exists a specific, valid reason for going into executive session, but also make it somewhat onerous and time consuming for the board to do so. A board required by law to follow the procedure of Miss. Code Ann. § 25-41-7 will no doubt be less inclined to go into executive session than a board at liberty to do so simply by publicly stating it is going into executive session.
Yet, as shown by Miss. Code Ann. § 25-41-7(4) there is a great number of reasons authorizing a board to hold an executive session, some of them overlapping. As applicable to a board of supervisors, they may be summarized as follows:
1. Business related to personnel, the character, professional competence, and physical or mental health of a person.
2. Strategy sessions regarding litigation, "when an open meeting would have a detrimental effect on the litigating position" of the board
3. Business as to security personnel, plans or devices.
4. Where the board is involved in investigative proceedings regarding misconduct or illegality.
5. Extraordinary emergency posing immediate or irrevocable harm to persons or property.
6. Proposed sale, purchase or leasing of lands.
7. Industrial or business prospects as to location, relocation or expansion.
8. Employment and termination of employees, including deletion of jobs from budget. But final budgetary adoption must be in Open Meeting.
Miss. Code Ann. § 25-41-7(3) also states that no executive session can be used to circumvent or to defeat the purposes of Open Meetings Chapter.

FACTS
On February 25, 1982, Common Cause, a nonprofit corporation, along with several individual plaintiffs filed a suit in the chancery court of the First Judicial District of Hinds County to place the Board of Supervisors under an injunction, enjoining the Board to comply with the Open Meetings Act. The Board members at the time were Roger C. Stewart, Walter L. Dennis, George Smith, Pal R. Jones and Bennie Thompson.
A consent decree was entered by the chancery court on May 10, 1982, which was prepared jointly by attorneys for the Board and the plaintiffs. The Consent Decree is set forth in full in Appendix B.
On November 14, 1983, the plaintiffs filed a motion to hold the defendants in contempt. Added as a named defendant was Hershel Wilbourn, who had replaced *113 Jones on the Board.[2] On February 21, 1984, the Mississippi Publishers Corporation moved under Rule 24(b) Mississippi Rules of Civil Procedure (MRCP) to intervene as a plaintiff, later sustained by the court.
The motion for contempt was amended several times. Finally, on September 12, 1984, the plaintiffs filed an "Amended Complaint" which set forth over fifty allegations of violations of the Consent Decree. This final amended complaint formed the basis for the contempt hearing. The named defendants were Thompson, Wilbourn, Stewart, Smith and Frank J. Bryan, Jr., who had replaced Dennis on the Board.
On October 3, 1984, Smith, Wilbourn, Stewart and Dennis moved to vacate the Consent Decree, contending it was void for lack of specificity as required by Rule 65, MRCP.
The Consent Decree for the most part simply enjoined the defendants from violating the Act. As to litigation matters, however, for which Miss. Code Ann. § 25-41-7(4)(b) authorizes an executive session, the Consent Decree was more restrictive. Paragraph 2(b) provided that "prospective" litigation was limited to an action which had been commenced in court, or where the board had received a "formal demand threatening the imminent commencement of an action," or where the board members were plaintiffs in an "imminent action." Also, paragraph 3 of the Decree required that on litigation matters the "action shall be identified by court, style, and number of the action, and reason shall be given why an open meeting would be detrimental to the litigation position of the board or its members."
Also, under Paragraph 2(f) of the Decree regarding the exemption of the discussion of the purchase, sale or lease of lands, added in the Decree is a requirement that the parcels of land be identified before the Board may enter executive session, and under Paragraph 2(g) of the Decree, regarding the exemption of the discussion of the location, relocation or expansion of a business or industry, added is the requirement that the business or location be identified prior to entering executive session.
Copies of minutes from 60 Board minutes were introduced into evidence. None of these minutes complied with Miss. Code Ann. § 25-41-7. At no time did a Board member move to close the meeting in order to determine whether the Board should go into executive session. Instead, the minutes repeatedly show that a motion was made to go into executive session to discuss some generalized subject such as "personnel matters," or "litigation," following which the Board closed the meeting. Occasionally on "litigation" the minutes recite what purports to be a style of a case. For example, the February 18, 1983, minutes, Exhibit 18, states, "All four supervisors voted `aye' to discuss Gates v. Collier in Executive Session." The March 7, 1983, minutes, Exhibit 27, states that litigation as pertaining to the "Hinds County v. Ben Johnson Case." The February 6, 1984, minutes, Exhibit 41, states pending litigation on "Kimball v. Hinds County and Yonkins v. Hinds County." As above noted, most of the minutes did not even give the style of the case, simply stating "litigation" and let it go at that. Personnel matters were likewise vague.
The authorization to go into executive session to discuss "personnel matters," of course, embraces a large area of subject matter. Obviously, however, there is any number of matters of discussion involving the employees of an organization which would never require an executive session. Commendations, need to work overtime upon occasion, shift in hours of employment, increase in life insurance, any of these might very well come under the heading of "personnel matters," but they are hardly the stuff for which a board would trouble itself to go into executive session.
It will not suffice that the reason for which the Board went into executive session may or may not have fit under the *114 rubric "personnel matter," but also whether the Board gave a meaningful reason to the audience, and thereafter recorded in the minutes, for doing so. Miss. Code Ann. § 25-41-7(3) states that no executive session can be "used to circumvent or to defeat the purposes" of the Act.
A meaningful reason is of sufficient specificity that the audience will at some later date be able to check it out. Did the Board in fact discuss that particular matter, or confine its executive session to that particular matter?
A board which only announces "litigation" or "personnel matters" for going into executive session has said nothing. It might as well have stated to the audience, "Ladies and gentlemen, we are going into executive session," and stopped there. The Act requires that a board cannot use its statutory authority to go into executive session upon certain matters as a device to circumvent the very purposes for which it is under the Open Meetings Act. The purpose of the Act is that the business conducted at all meetings of public boards be wide open.
Here the minutes reveal the Board failed woefully to comply with the Act. Had the Board, as required by the Act, first closed its meeting to discuss a need to go into executive session at all on these various matters, the Board president could quite easily have given the audience a reason with some particularity, some specificity and some meaning.
The Board's disregard for the Act and Consent Decree is well illustrated in its discussions pertaining to hiring architects.
According to Thompson, in October and November, 1982, the Board held private meetings regarding employment of architects. The members had a special voting system, each member voting for two firms, and the firm with the most votes got one job, and the firm with the next highest votes got another job. The public did not know of the decision until March, 1983, when an announcement was made that the Board had hired the architectural firms. The decision had already been made, however. Architectural firms called Thompson during the interim and he informed them of the Board's selection.
Natie P. Caraway, the Board's attorney, testified the meetings were closed because hiring architects was a personnel matter under the Act. We do not agree. Hiring persons or firms who in the law will be regarded as independent contractors will almost never be "personnel matters."
In the first place, retaining architects or any other professional firm to do public work is not a personnel matter. Rowen v. Santa Clara Unified School Dist., 121 Cal. App.3d 231, 175 Cal. Rptr. 292 (1981). In Board of Trustees v. Miss. Publishers Corp., supra, we held that the Act is to be construed liberally in favor of public access. Moreover, it is in the public interest that discussions with architect applicants, or any other applicant proposing to render public services or engage in a public contract, be entirely open.
Yet even if, somehow, the hiring of an architect were a "personnel matter," the Board was still required to effectuate such hiring at a public meeting of the Board. At this public meeting, if the Board considered that some discussion with an architect were appropriate for an executive session, it was required to take a vote as above set forth, and announce to the audience that the Board was going into executive session to discuss whatever the subject was with the architects. It certainly had to do more than simply go into executive session with the comment "personnel matters."
On March 7, 1983, Exhibit 27, the minutes recite:
Motion was made by Noel McKay[3] and seconded by Walter Dennis, all voting aye, to go into executive session to discuss personnel matters ...
Thompson testified "personnel matters" was to get a follow-up report from the architectural firms. Caraway testified this *115 was strictly a negotiation session with the architects as to their fees and accordingly was appropriate for executive session. This discussion clearly was not a "personnel matter" within the statute, as just noted, and the Board was required to give a meaningful reason for declaring an executive session. Again, this was a clear-cut violation of the Consent Decree.
The minutes of June 14, 1982, Exhibit 46, is likewise illustrative:
Bennie Thompson requested that John Brown be appointed to the Planning Board. Roger Stewart requested that this appointment be delayed until the next Board Meeting after the Board had time to discuss the matter. Natie Caraway recommended that the Board go into Executive Session to discuss this appointment along with other personnel matters and pending litigation. All voted in favor. [Emphasis added]
The reason the Board attorney asked the Board to go into executive session was because he felt the Board was liable for suit and identifying the potential action would be self-defeating. The attorney's advice to the Board, of course, was privileged, but the subject matter of the litigation was not privileged, either under the Consent Decree or the Act.
In summary we find:
1. The procedure required by the Act for going into executive session was ignored.
2. The requirement of the Consent Decree as to identifying the litigation was ignored.
3. Stating the purpose of going into executive session was to discuss other matters than pending litigation was vague, misleading and deceptive.

CHANCELLOR'S FINDINGS
In a 127-page opinion the chancellor made his findings of fact and conclusions of law. The evidence adduced was meticulously recounted. The chancellor concluded that the Consent Decree had been violated in many instances, and that the minutes had not complied with it. He found the Board failed to properly identify the subject matter of an executive session, especially litigation; the Board went into executive session for reasons not authorized by the Consent Decree or the Act; and the Board had not given proper notice of its special meetings.
The following examples again illustrate how the Act and Consent Decree were ignored, and, consequently, the public misled:
(1) The minutes of February 6, 1984, show the Board unanimously voted to enter executive session to discuss "personnel matters and pending litigation." The cases discussed were identified as "Kimball v. Hinds County" and "Yonkins v. Hinds County." During this executive session, and without prior announcement, the Board discussed and took action on an on-going investigation by the sheriff's department of wrongdoing by county employees in connection with the county data processing office. While this topic, as contended at trial, may have been exempt under Miss. Code Ann. § 25-41-7(4)(d), failure to announce it made the topic inappropriate. Additionally, no record of the votes was placed in the minutes. Section 25-41-11.
(2) On August 9, 1982, the Board held an executive session to discuss "budget matters," but without further definitiveness, and consequently it remains unknown, as no one present at this meeting could remember, whether or not this discussion related to final budgetary adoption, which is required under Miss. Code Ann. § 25-41-7(4)(c) to be discussed in open meeting.
(3) The minutes of September 23, 1982, show the Board unanimously voted to enter executive session, yet give no reason for doing so, or informing what action was taken as required by Miss. Code Ann. § 25-41-11.
(4) On November 18, 1982, the Board entered executive session to discuss, among other things, "pending litigation" and "Murray Stewart's Landfill." "Pending litigation" was inadequate, and also, it was not explained under what statutory exemption discussion of the landfill fell or why an executive session was necessary. *116 Consequently, the public was yet again left uninformed, thwarting the Act.
(5) In October or November, 1983, the Board held several sessions with city officials, including the mayor and city commissioners, to discuss developing a sewage system in south Hinds County to induce homeowners to build in this area. The two bodies met with several people, including the city engineer, the head of HUD and the head of FHA, to discuss the feasibility of forming a water and sewage district, and the availability of funds to assist the city and county with this problem. No notice of this meeting was given to the public, in violation of Miss. Code Ann. § 25-41-13(1); no vote was taken to determine if executive session was necessary, in violation of Miss. Code Ann. § 25-41-7(1), (2); and no minutes of the meeting were kept, in violation of Miss. Code Ann. § 25-41-11. The public had no official way of knowing these meetings of obvious public import were occurring. We are not persuaded by the Board's contention that these meetings did not come under the Act. Miss. Code Ann. § 25-41-3 defines meeting as "an assemblage of members of a public body at which official acts may be taken upon a matter over which the public body has supervision, control jurisdiction, or advisory power." Further, Board of Trustees v. Miss. Publishers Corp., supra, states official acts include action relating to formation and determination of public policy, and all deliberative stages of a decision-making process which lead to formation and determination of public policy, are meetings within Miss. Code Ann. § 25-41-7(4). Finally, as stated in Miss. Code Ann. §§ 25-41-1 and 25-41-5 formation and determination of public policy is public business to be conducted in open meeting unless exempted. These were official meetings under the Act and the Consent Decree, and the Board's manner of meeting with these officials violated both the Act and the Consent Decree.

CHANCELLOR'S JUDGMENT
The chancellor found all defendants had violated the injunction and were guilty of civil contempt.
At the same time he concluded the defendants had not willfully or maliciously violated its terms, or engaged in any scheme to do so. He also found that between the individual members and their attorney there was honest disagreement as to the meaning of the Consent Decree, and that they had in good faith relied upon the advice of their attorney. He therefore concluded they were not guilty of criminal contempt.
He did, however, impose criminal sanctions on each Board member, sentencing them to varying jail sentences and fines, but suspended them on good behavior. He also ordered each defendant to perform a designated community service work as part of his sentence.
The chancellor disallowed attorney's fees. He also found the terms of the Consent Decree unsatisfactory because of its vagueness and the present uncertainty of the law interpreting the Act, and vacated the Decree.

THE DIRECT APPEALS
Roger C. Stewart, Walter L. Dennis, George Smith, and Hershel Wilbourn have appealed, assigning as error the following:
I. THE TRIAL COURT ERRED IN IMPOSING CRIMINAL PENALTIES WITHOUT PROOF OF WILLFUL, INTENTIONAL AND/OR CONTUMACIOUS BEHAVIOR.
II. THE TRIAL COURT ERRED IN HOLDING THE DEFENDANTS IN CONTEMPT WITHOUT PROOF OF PREJUDICE OR DAMAGE.
III. THE TRIAL COURT ERRED IN DENYING THE APPELLANTS' MOTION TO VACATE THE CONSENT DECREE ON GROUNDS THAT IT VIOLATED THE SPECIFICITY REQUIREMENTS OF RULE 65(d), MISSISSIPPI RULES OF CIVIL PROCEDURE.
IV. THE TRIAL COURT ERRED IN HOLDING THAT THE MISSISSIPPI OPEN MEETINGS ACT APPLIES TO ALL INFORMAL, IMPROMPTU MEETINGS.

*117 V. THE TRIAL COURT ERRED IN HOLDING THE DEFENDANTS IN CONTEMPT OF A VAGUE DECREE.
Bennie Thompson and Frank Bryan, each represented by separate counsel, have likewise appealed. Thompson makes numerous assignments of error, among them contending, as does Bryan, that he was not guilty of contempt. We find this contention dispositive of Thompson and Bryan and do not address their remaining assignments of error.

LAW
Stewart's, Dennis's, Smith's and Wilbourn's assignments I, II and V may be dealt with together. Did the court err in finding them in civil contempt because (1) there was no proof of damage, (2) the Consent Decree was vague, and (3) although they were found guilty of civil contempt, at the same time it was found their conduct was neither willful, malicious or contumacious. Also, did the court err in imposing criminal penalties?

I. CIVIL CONTEMPT

A. PROOF OF DAMAGES
Our inquiry is not whether the Board, once it had shut its doors to the public, engaged in illegal, reprehensible, or even inappropriate actions, although it is more frequently the case than not that when men desire secrecy it involves some matter or discussion they would not be comfortable becoming public knowledge at any time. Hence the reason for sunshine activity.
Our focus, rather, is whether the Board:
1. used the proper procedures for going into executive session,
2. restricted executive sessions to subjects excepted under the Act, and otherwise, and/or
3. violated the express terms of the Act and Consent Decree
The chancellor found that they did violate the Decree and Act, and he was manifestly correct.
We find calloused indifference to the explicit terms of the Consent Decree on the part of these supervisors. If they paid any attention to it at all, it was minimal. The various Board minutes are deplorable. They are vague, incomprehensible and even misleading. We are not unmindful of past decisions of this Court giving lenience to minutes of boards of supervisors. McKenzie v. Smith, 219 Miss. 852, 70 So.2d 3 (1954); Federal Land Bank of New Orleans v. Cox, 183 Miss. 250, 183 So. 482 (1938); Martin v. Winston County, 181 Miss. 363, 178 So. 315 (1938); Noxubee County v. Long, 141 Miss. 72, 106 So. 83 (1925). Board of supervisors' attorneys these days are adequately compensated, and well capable of insuring by appropriate advice and guidance that their clients' minutes have been properly prepared. Especially is this true in the most populous county in this state, and most especially when the Board is under a court injunction. Our past leniency should not be stretched to cover a situation as presented in this case.
The assertion that the plaintiffs showed no prejudice or harm to themselves because of failure of the Board to meet the technical requirements, and that this constitutes a defense to the contempt charge, is specious. These plaintiffs are citizens of this state seeking to enforce not only the law, but a court decree requiring the Board to obey the Act. Common Cause and Mississippi Publishers in this instance are representatives of the citizens of this state and the public had the right to go to chancery court and demand enforcement of the Act. Miss. Code Ann. § 25-41-15 states:
The chancery courts of this state shall have the authority to enforce the provisions of this chapter upon application of any citizen of the state, and shall have the authority to issue injunctions or writs of mandamus to accomplish that purpose.

B. VAGUE DECREE
Stewart, Dennis, Smith and Wilbourn moved on October 2, 1984, to have the Consent Decree vacated because it was void for not complying with the specificity *118 requirements of MRCP 65(d)(2), which states the following:
(d) Form and Scope of Injunction or Restraining Order
* * * * * *
(2) Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document the act or acts sought to be restrained; and is binding only upon the parties to the action, the officers, agents, servants, employees, and attorneys, and upon those persons in the active concert or participation with them who receive actual notice of the order by personal service or otherwise.
The trial court reserved a ruling on the motion to vacate pending trial. In his findings of fact and conclusions of law, the chancellor vacated the Decree and state:
As time passes and more cases are decided, it is likely that some of the terms, verbage [sic] and language of the consent decree will conflict with some cases.
To avoid the possibility of future conflict, this Court is of the opinion that it should resolve that problem and make its ruling on the Defendants' Motion to Vacate the Consent Decree or Modify.
Therefore, the Motion of the Defendants is granted and the Consent Decree shall be vacated and set aside.
These defendants now argue that the trial judge should have vacated the Consent Decree at the time the motion was made, not at the conclusion of the trial, and consequently have made the issue of contempt moot. In this they are wrong, because an inquiry into the merits of the Consent Decree is not permitted where the alleged contempt consisted of failure to comply with the terms of the Decree. The chancellor acted correctly in determining whether the defendants' actions constituted contempt against the Consent Decree. A consent decree is presumed valid and enforceable, and can only be attacked on the grounds of fraud, accident, mistake or surprise which must have been the controlling factors in the effectuation of the decree. See, Matter of Hailey, 621 F.2d 169 (5th Cir.1980); Wray v. Langston, 380 So.2d 1262 (Miss. 1980); McIntosh v. Munson Road Machinery Co., 167 Miss. 546, 145 So. 731 (1933). Invalidity of a defied court order is ordinarily no defense to a charge of contempt. See, Hyde Const. Co., Inc. v. Koehring Co., 387 F. Supp. 702, modified in part, rev'd in part, 546 F.2d 1193, reh. denied in part, granted in part, 551 F.2d 73 (5th Cir.1974).
In Masonite Corp. v. Int'l Woodworkers, 206 So.2d 171 (Miss. 1967), this Court stated:
[T]he person who disobeys the order of the court of general jurisdiction does so at his peril. It is no answer that the order was improvidently or erroneously granted. Griffith, Mississippi Chancery Practice, § 668 (2d ed. 1950). If a party could disobey a decree by a court of general jurisdiction, and defend on the ground that in his opinion the decree was erroneous, appellees would be constitutionally free to ignore all of the procedures of the law and respect for judicial process. Appellees could not bypass orderly judicial review of the injunction by disobeying it. Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); Howat v. State of Kansas, 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550 (1922).
Id. at 183.
Furthermore, each supervisor individually read and approved the Consent Decree before it became effective. The motion to vacate was not filed until after suit had been brought against the supervisors for failure to comply with the Consent Decree, and only then did the supervisors begin arguing that the Consent Decree did not meet specificity requirements. Had the supervisors believed the Decree failed to meet the specificity requirements, they should have brought a motion to vacate. See, Bryant, Inc. v. Walters, 493 So.2d 933 (Miss. 1986); Burns v. Delta Loans, Inc., 354 So.2d 268 (Miss. 1978); City of Starkville v. Thompson, 260 So.2d 191 (Miss. 1972); Strain v. Gayden, 197 Miss. 353, 20 *119 So.2d 697 (1945). See generally, 49 C.J.S. Judgments, § 330 (1947).
Additionally, MRCP 60(b) provides parties with an avenue for relief from a judgment or order and states the following:
RULE 60. RELIEF FROM JUDGMENT OR ORDER
* * * * * *
(b) Mistakes; Inadvertence; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a part or his legal representative from a final judgment, order, or proceeding for the following reasons:
* * * * * *
(2) accident or mistake;
* * * * * *
(4) the judgment is void;
* * * * * *
(6) any other reason justifying relief from the judgment.
The motion shall be made within a reasonable time, and for reasons (1), (2) and (3) not more than six months after the judgment, order, or proceeding was entered or taken. A motion under this sub-division does not affect the finality of a judgment or suspend its operation... . The procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action and not otherwise.
Had the supervisors felt aggrieved with the Consent Decree and had a bona fide reason for relief therefrom, any such motion should have been made "within a reasonable time" as provided in Rule 60(b). Instead these supervisors waited over two years, and only after being cited for contempt before they brought a motion to vacate. Accordingly, because they failed to follow the procedure of 60(b), they are now estopped from asserting the Consent Decree should be vacated for lack of specificity. Moreover, because there was no showing of fraud, collusion, accident, mistake, etc., the Consent Decree was presumptively valid and the trial judge erred in vacating it.
In Hall v. Wood, 443 So.2d 834 (Miss. 1983), the following is stated:
On the matter of the content of the specific injunction issued, we applaud the wisdom of the chancellor's recognition that no court under such circumstances should "try ... to spell out exactly what should be done to stop the erosion." We emphasize that his failure in this regard in no way runs afoul of long established rule that mandatory injunctions must be clear and explicit on their face so that the party enjoined will be distinctly informed as to what he is enjoined from doing or what he is commanded to do. See, e.g., Illinois Central Railroad Co. v. George, 241 Miss. 233, 238, 130 So.2d 260, 261 (Miss. 1961); Lauck v. Gilbert, 252 Miss. 371, 393, 173 So.2d 626, 636-637 (Miss. 1965). Nor did the chancellor depart from our current rule found in Rule 65(d)(2), Miss.R.Civ.P., which in pertinent part provides:
Each order granting an injunction ... shall be specific in terms; [and] shall describe in reasonable detail and not by reference to the complaint or other document the act or acts sought to be restrained; ...
When ordering the achievement of ends necessarily reached only through the employment of scientific or engineering techniques, courts of equity should be particularly cautious. An overly precise specification of means will generally be beyond judicial competence in fact or in law. What should and ought to be done is the very clear specification of the end to be achieved. The party enjoined should then be directed to proceed with reasonable dispatch.
The court should be as clear as it reasonably can be in specifying the end which the party enjoined must achieve. On the other hand, it ordinarily will be appropriate to leave the party enjoined maximum flexibility with regard to the means of achieving the end.

Id. at 841-842. [Brackets original; emphasis original] See also, Georgia Pacific Corp. v. Armstrong, 451 So.2d 201 (Miss. 1984).
*120 Nor was the Decree objectionable because it was framed in the language of the statute, especially since it had been shown that prior to its issuance the defendants had repeatedly violated it. Murphy v. State, 202 Miss. 890, 32 So.2d 875 (1947); Brooks v. State, 219 Miss. 262, 68 So.2d 461 (1953); McGowan v. State, 258 So.2d 801 (Miss. 1972); McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1948). Indeed, Miss. Code Ann. § 25-41-15 specifically authorizes chancery courts to enter decrees to enforce the provisions of the Act.
Finally, and most importantly, the acts for which these Board members were in contempt were set forth with sufficient specificity in the Consent Decree. If there are areas of disagreement as to future conduct, the Board members' remedy is to petition the chancery court for clarification or modification. Troxler v. St. John the Baptist Parish Police Jury, 469 F.2d 647 (5th Cir.1972); Klein v. Weber, 45 A.D.2d 759, 356 N.Y.S.2d 686 (1974); Morgan's Home Equip. Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957). The specific directions of the Consent Decree by no means extended further than authorized in enforcement of the Act.

C. WHAT KIND OF CONTEMPT?
These defendants argue that the chancellor erred in imposing criminal penalties upon them when he had found their conduct was not willful, intentional, or contemptuous. For reasons discussed below, we reverse the contempt finding as to Thompson and Bryan but affirm as to the remaining Board members.
The chancellor specifically found that the defendants had not willfully or intentionally violated the Consent Decree and were not guilty of criminal contempt. Yet, he imposed penalties authorized only when there has been a finding of criminal contempt. In this he erred.
While a person may be fined or placed in jail for civil contempt, it must be conditioned so that upon his performing the court-required act, he is relieved of the penalty. A civil contempt penalty is coercive, while a criminal contempt penalty is punishment.
The landmark case which distinguishes civil and criminal contempt is Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911), which states the following:
Contempts are neither wholly civil nor altogether criminal. And "it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both." Bessette v. Conkey, 194 U.S. [324], [24 S.Ct. 665, 667, 48 L.Ed. 997 (1904)]. It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. ... [I]mprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.
* * * * * *
On the other hand, if the defendant does that which has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates, not as a remedy coercive in its nature, but *121 solely as punishment for the completed act of disobedience. [Emphasis added]
221 U.S. at 441, 443, 31 S.Ct. at 498, 55 L.Ed. at 806.
Further, this Court in Masonite Corp., supra, stated:
[G]enerally, the determining factor as to whether a contempt is to be classified as civil or criminal is the purpose for which the power is exercised. State v. Wingo, 221 Miss. 542, 547, 73 So.2d 107, 109 (1954); 17 Am.Jur.2d Contempt § 5(2) (1963)... .
It will be seen that these statutes have evident reference to two classes of contempts, and these classes are: (1) Those prosecuted to preserve the power and vindicate the dignity of the court, and to punish for disobedience of its orders; and (2) those instituted to preserve and enforce the rights of private parties to suits. In the first the punishment is for a past offense and must be suffered; in the second the contemnor can discharge himself by paying the costs and expenses and doing what he had previously refused to do. Approximately these two classes are distinguished as criminal and civil, but the same act which constitutes a civil contempt may be also of the other class and vice versa. * * *
The power of the court to imprison in a civil contempt in order to coerce the performance of a decree is without limit because, as already said, the contemnor himself may end the sentence by performing the decree or by declaring his willingness to perform it,  and being released he proceeds so to do with costs, if within his power.
* * * * * *
The test is, what is the primary purpose of the suit? If it is for preserving and enforcing the rights of private litigants, ... the contempt is civil.
Id. at 178-179. [citations omitted]

D. PENALTIES?
Having found the defendants not guilty of criminal contempt, it follows that the chancellor was without authority to give each fixed jail sentences and fines, and the judgment of the chancery court, insofar as it imposed fixed sentences and fines upon these defendants, must be reversed.
Nor can this court, after a finding of not guilty of criminal contempt by the trial court, reverse such finding. Masonite Corp. v. Int'l Woodworkers, 206 So.2d 171 (Miss. 1968). No more than could this Court reverse a jury's verdict that an accused stand acquitted of a criminal charge. This, however, in no manner affects the adjudication by the chancellor that the defendants were guilty of civil contempt. While we are powerless to reverse on his finding of not guilty of criminal contempt, we find that the chancellor was manifestly wrong when he concluded that Supervisors Stewart, Dennis, Smith and Wilbourn had not willfully and intentionally violated the Consent Decree. The record clearly shows time and again the contrary to be the case. These defendants may not have realized the full import and significance of their disobedience, but they could not have been blind to the fact that they were not complying with the Decree or the Act. Also, in order to find the defendants guilty of civil contempt, it was not necessary that the chancellor first find they acted in bad faith or willfully violated the act. McComb v. Jacksonville Paper Co., supra; see also, Bird v. Johnson, 234 Ind. 555, 130 N.E.2d 29 (1955); Patten v. Miller, 190 Ga. 152, 8 S.E.2d 786 (1940). Therefore, except as to Thompson and Bryan, the facts in this case warranted a finding of criminal contempt, and clearly support his finding of civil contempt. In this case the acts of these defendants were quite analogous to the defendants in McComb v. Jacksonville Paper Co., supra, in which the Supreme Court stated:

Second. As we have noted the decree directed respondents to obey the provisions of the Act dealing with minimum wages, overtime, and the keeping of records. There was no appeal from it. By its terms it enjoined any practices which were violations of those statutory provisions. Decrees of that generality are often necessary to prevent further violations where a proclivity for unlawful *122 conduct has been shown. [citations omitted] Respondents' record of continuing and persistent violations of the Act would indicate that that kind of a decree was wholly warranted in this case. Yet if there were extenuating circumstances or if the decree was too burdensome in operation, there was a method of relief apart from an appeal. Respondents could have petitioned the District Court for a modification, clarification or construction of the order. [citations omitted] But respondents did not take that course either. They undertook to make their own determination of what the decree meant. They knew they acted at their peril. For they were alerted by the decree against any violation of specified provisions of the Act.
It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience of the law which we condemned in Maggio v. Zeitz, supra (333 US [56] at 69, 92 L ed [476 at] 487, 68 S Ct 401 [at 408 (1948)]). The instant case is an excellent illustration of how it could operate to prevent accountability for persistent contumacy. Civil contempt is avoided today by showing that the specific plan adopted by respondents was not enjoined. Hence a new decree is entered enjoining that particular plan. Thereafter the defendants work out a plan that was specifically enjoined. Immunity is once more obtained because the new plant was not specifically enjoined. And so a whole series of wrongs is perpetrated and a decree of enforcement goes for naught.
That result not only proclaims the necessity of decrees that are not so narrow as to invite easy evasion; it also emphasizes the danger in the attitude expressed by the courts below that the remedial benefits of a decree will be withheld where the precise arrangement worked out to discharge the duty to pay which both the statute and the decree imposed was not specifically enjoined.
We need not impeach the findings of the lower courts that respondents had no purpose to evade the decree, in order to hold that their violations of it warrant the imposition of sanctions. They took a calculated risk when under the threat of contempt they adopted measures designed to avoid the legal consequences of the Act. Respondents are not unwitting victims of the law. Having been caught in its toils, they were endeavoring to extricate themselves. They knew full well the risk of crossing the forbidden line. Accordingly where as here the aim is remedial and not punitive, there can be no complaint that the burden of any uncertainty in the decree is on respondents' shoulders.
336 U.S. at 192, 69 S.Ct. at 500, 93 L.Ed. at 563.

THOMPSON'S AND BRYAN'S APPEAL
The record reveals entirely different conduct by Supervisors Thompson and Bryan. Although called as adverse witnesses by the plaintiffs, they were clearly willing and helpful in their testimony. They were the only supervisors who testified at trial.
Both had attempted from time to time to remonstrate with their fellow Board members. At times the only objection raised to an executive session came from one, or both these supervisors. It is apparent from this record that had Thompson and Bryan constituted a majority of the Board, these contempt proceedings would never have been necessary.
Indeed, in oral argument counsel for the plaintiffs stated that these two acted in good faith, and as individual Board members, had attempted to comply with the Consent Decree.
We therefore hold that the chancellor erred in finding Thompson and Bryan guilty of civil contempt along with the other Board members, and reverse and render his finding as to them.

II. INFORMAL AND IMPROMPTU MEETINGS UNDER THE ACT
We are not prepared to say that every informal or impromptu meeting *123 which the Board members may attend automatically comes under the purview and mandate of the Act. A public board should be available for social functions with charities, industries and businesses, at which no action is taken and their only function is to listen, without being subjected to the Act. Therefore, a function attended by a public board, whether informal or impromptu, is a meeting with the meaning of the Act only when there is to occur "deliberative stages of the decision-making process that lead to formation and determination of public policy." Board of Trustees, supra, 478 So.2d at 278. Accordingly, we reverse to the extent the chancellor's finding is in conflict with this opinion.

SUMMARY
In summary on direct appeal, we affirm the chancellor's finding that the defendants Stewart, Dennis, Smith and Wilbourn were guilty of civil contempt, but reverse and render his imposition of criminal penalties upon them.
We also affirm the chancellor's refusal to vacate the Consent Decree on these defendants' motions, finding the Consent Decree valid and binding.
We reverse and render the chancellor's ruling and judgment that Supervisors Thompson and Bryan were in civil contempt.
Finally, we hold that the attendance by Board members individually or in a body at social functions, or attendance at charities, or with industry or business representatives when their only purpose and function is to listen, and to take no official action at the time, are not public meetings within the Act. To the extent the chancellor's ruling is inconsistent with this holding, it is reversed.

CROSS-APPEAL
Common Cause and Mississippi Publishers have cross-appealed assigning:
I. THE CHANCELLOR ERRED IN HIS REFUSAL TO FURTHER DEFINE "PERSONNEL MATTERS."
II. THE CHANCELLOR ERRED IN REFUSING TO AWARD ATTORNEY'S FEES TO PLAINTIFFS.
III. THE CHANCELLOR ERRED IN VACATING THE CONSENT DECREE.

I. PERSONNEL MATTERS
The chancellor gave dictionary definitions of "personnel" and "matter," following which he concluded that "personnel matters could be any thing, content or thought relating to persons employed," and "that it was not limited to one employee, but encompasses in the broad sense in any way such employees are affected." Words such as "insurance," "holidays," "parking spaces," "architects," and even "Ross Barnett Reservoir," might in the chancellor's view "in common usage be a personnel matter." He also held that it was not limited to an employee's personal privacy or protection of his personal rights, although it could involve these as well. Finally, he held:
Such matters as the appointment or removal of hospital trustees, hiring of an accountant or bookkeeper, the ratification of the hiring of an Assistant District Attorney or a Court Reporter, or, the employment of a maintenance man to work in the courthouse with maintenance personnel employed by others, are, in the opinion of this Court, proper personnel matters qualified for consideration in closed session.
(Vol. XIII, p. 2725)
Common Cause and Mississippi Publishers first contend on cross-appeal that the chancellor erred in failing to further define "personnel matters." Miss. Code Ann. § 25-41-7(4)(a) reads:
(4) A public body may hold an executive session pursuant to this section for one or more of the following reasons:
(a) Transaction of business and discussion of personnel matters, or the character, professional competence, or physical or mental health of a person.
Compounding the difficulty of delineating the boundaries of "personnel matters" *124 are three further exceptions under Miss. Code Ann. § 25-41-7(4):
(c) Transaction of business and discussion regarding the report, development or course of action regarding security personnel, plans or devices.
(d) Investigative proceedings ... regarding allegations of misconduct or violation of law.
* * * * * *
(k) Transaction of business and discussions regarding employment and termination of employees.
In Board of Trustees v. Miss. Publishers Corp., supra, we adopted the "ordinary definition" of "personnel," in the absence of "statutory definition." We also held that any further definition would have to be addressed on a case-by-case basis, guided by general rules of construction, "together with the legislative intent of the Act and its declared policy." 478 So.2d at 280. In that decision we at least tacitly acknowledged the difficulty in fathoming a legislative intent to curtail, restrict or carefully mark the boundaries of "personnel matters."
In State v. Hernandez, 89 N.M. 698, 556 P.2d 1174 (1976), the New Mexico Supreme Court held that "personnel matters" in that state's public meeting law was not restricted to "matters relating to the discipline or hiring or dismissal of an employee." Rather, "personnel referred to a body of employees, and not to an `employee.'" "`Matters' in the context of `personnel matters,' clearly means those things, events, circumstances, situations, conditions or interests which relate to personnel."
Common Cause and Mississippi Publishers argue first that the exceptions defining "personnel matters" mean the "character, professional competence, or physical or mental health of a person." San Diego Union v. City Council, 146 Cal. App.3d 947, 196 Cal. Rptr. 45, 49 (1983); City of Kenai v. Kenai Peninsula Newspapers, 642 P.2d 1316 (Alaska 1982). They also argue that the exception should never be used to shield substandard performance. Times Publishing Co. v. Williams, 222 So.2d 470 (Fla. 1969); Common Cause v. Nuclear Regulatory Commission, 674 F.2d 921, 938 (D.C. Cir.1982); Wood v. Marston, 442 So.2d 934 (Fla.. 1983). Unfortunately for cross-appellants, the statutes considered in those cases are worded entirely different from, and are much more restrictive than the exceptions under our Act. "It is our duty to give the statutory language its literal and ordinarily accepted meaning." Roberts v. Miss. Republican Party, 465 So.2d 1050 (Miss. 1985); Lambert v. Ogden, 423 So.2d 1319 (Miss. 1982).
Rather than curtailing "personnel matters" into clearly defined specifics, our legislature prescribed another prophylatic against potential violation of the spirit of the Act: a demanding, precise and time-consuming procedure which must be followed before a board is authorized to go into executive session for any reason.
A public body which must follow these steps in each and every instance before it can legally go into executive session will be far less inclined to unnecessarily declare executive sessions.
We do, however, find some of the authorities cited by cross-appellants helpful. We have no difficulty holding that the words "personnel matters" are restricted to matters dealing with employees hired and supervised by the board, not those employees of some other county official, and not other county officials themselves. Nor, would a member of the board of supervisors be classified "personnel." Common Council of City of Peru v. Peru Daily, 440 N.E.2d 726 (Ind. App. 1982); Gannett Satellite Information Network v. Board of Education, 201 N.J. Super. 65, 492 A.2d 703 (1984). Moreover, an independent contractor such as an accountant, lawyer, or architect is not an employee of the board, and would not come under "personnel." Majority Opinion, supra, p. 114; Rowen v. Santa Clara Unified School Dist., 121 Cal. App.3d 231, 175 Cal. Rptr. 292 (1981), (holding a real estate specialist retained by board to assist in disposing of surplus property not an employee under the California public meetings act). We therefore hold that the Board was not entitled *125 to go into executive session under the "personnel matters" exception to consider appointments to fill a vacancy on the Board, to discuss employees of some other county official, or to consider the employment of, or discussions with, an architect concerning his employment.
We also hold that within the framework of the statutory language itself all statutory exceptions must, under the spirit and philosophy of the Act, be strictly construed against executive sessions. Ridenour v. Board of Education, 111 Mich. App. 798, 314 N.W.2d 760 (1981), and that no exception can be "as broad as the law itself." Maser v. City of Canton, 62 Ohio App.2d 174, 405 N.E.2d 731, 735 (1978). The very purpose of the Act is for all meetings to be open, public. It therefore follows that even though an executive session might come under "personnel matters," or another of the subjects listed under Miss. Code Ann. § 25-41-7(4), this in and of itself is insufficient in the absence of at least a reasonably arguable basis of an actual, present need for a closed meeting on the subject. To hold otherwise would indeed be making the exception as broad as the Act itself, and emasculate the admonishment of Miss. Code Ann. § 25-41-7(3): "... nor shall any executive session be used to circumvent or to defeat the purposes of this chapter." It is "essential" that "public business be performed in an open and public manner." Miss. Code Ann. § 25-41-1. Majority Opinion, supra, pp. 113-114.
The chancellor's opinion, insofar as it varies from our holdings, is reversed.

II. VACATION OF CONSENT DECREE
As noted above, the chancellor at the conclusion of the trial vacated the Consent Decree "to avoid the possibility of future conflict" arising from it. In this the chancellor erred. If the Consent Decree was too vague or needed clarification, the course of action for the Board members, as also noted above, was to ask a court for assistance, and failing that the Consent Decree is to remain in effect until the Board has shown a willingness and actual practice over a period of time of compliance with the Consent Decree. See, United States v. Lawrence County School Dist., 799 F.2d 1031 (5th Cir.1986), reh. denied, 808 F.2d 1063 (5th Cir.1986); Bryant, Inc. v. Walters, supra; Equitable Life Assur. Soc. of U.S. v. Gex Estate, 184 Miss. 577, 186 So. 659 (1939); Bynum v. Meyer, 48 So. 289 (Miss. 1909). Therefore, we reverse the chancellor's order vacating the 1982 Consent Decree and hold that this Decree is to remain in effect until the chancery court, after a full hearing on the matter, determines and finds there is no further need for an injunction.

III. ATTORNEY'S FEES
Common Cause and Mississippi Publishers argue that in cases such as this, the defendants, or violators of the Act, should be required to pay attorney's fees because otherwise an individual or body will be reluctant to bring suits to enforce compliance with the statute. In a civil contempt proceeding, the trial court has discretion to award reasonable attorney fees to make the plaintiff whole and to reinforce compliance with the judicial decree. See, Sebastian v. Texas Dept. of Corrections, 558 F. Supp. 507 (S.D.Texas 1983); Cook v. Ochsner Foundation Hospital, 559 F.2d 270 (5th Cir.1977); Bonanza Int'l, Inc. v. Corceller, 343 F. Supp. 14 (E.D.La. 1972). Furthermore, a trial court has inherent authority to award attorney fees in a civil contempt proceeding for non-compliance with an injunction whether the non-compliance was intentional or unintentional. See, Sebastian, supra; Cook, supra.
The theory for awarding attorney's fees, as stated in Cook, supra, is two-fold. First, to enforce compliance with the injunction, and second, to compensate the prevailing party for losses sustained by reason of non-compliance. Cook, 559 F.2d at 272. See also, Lance v. Plummer, 353 F.2d 585 (5th Cir.1965); Nasco, Inc. v. Calcasieu Television & Radio, Inc., 583 F. Supp. 115 (W.D.La. 1984).
We agree that the plaintiffs should have been awarded fair and reasonable attorney's fees to be assessed against the individual Board members Stewart, Dennis, Smith and Wilbourn. We therefore reverse the disallowance of attorney's fees.
*126 The amount of the fees to be awarded we leave in the broad discretion of the chancellor upon remand. We refrain from setting any particular standard or guide at this time in setting such fees. Chancellors of this state are routinely required to set fair and reasonable attorney's fees in various types of cases, and do so, considering the parties, the nature of the case, the legal services performed, and what is equitable in that particular case. The ultimate objective in this case is to assure a faithful compliance with the Consent Decree.
In summary on cross-appeal, we reverse the chancellor's definition of "personnel matters" to the extent it is inconsistent with this opinion, we reverse and render his vacating the Consent Decree, herewith reinstating it, and reverse his disallowance of attorney's fees, and remand for awarding attorney's fees to the plaintiffs.
ON DIRECT APPEAL, AFFIRMED IN PART, REVERSED AND RENDERED IN PART, AND REVERSED IN PART.
ON CROSS-APPEAL, REVERSED AND REMANDED IN PART, AND REVERSED AND RENDERED IN PART.
ROY NOBLE LEE, C.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and PITTMAN, JJ., concur.
DAN M. LEE, P.J., concurs as to parts I-C and I-D on direct appeal; and dissents without written opinion as to Parts I-A and I-B on direct appeal and parts I, II and III on cross-appeal.
BLASS, J., not participating.

APPENDIX A
§ 25-41-7. Executive sessions.
(1) Any public body may enter into executive session for the transaction of public business; provided, however, all meetings of any such public body shall commence as an open meeting, and an affirmative vote of the three-fifths (3/5) of all members present shall be required to declare an executive session.
(2) The procedure to be followed by any public body in declaring an executive session shall be as follows: Any members shall have the right to request by motion a closed determination upon the issue of whether or not to declare an executive session. Such motion, by majority vote, shall require the meeting to be closed for a preliminary determination of the necessity for executive session. No other business shall be transacted until the discussion of the nature of the matter requiring executive session has been completed and a vote, as required in subsection (1) hereof, has been taken on the issue.
(3) An executive session shall be limited to matters allowed to be exempted from open meetings by subsection (4) of this section. The reason for holding such an executive session shall be stated in an open meeting, and the reason so stated shall be recorded in the minutes of the meeting. Nothing in this section shall be construed to require that any meeting be closed to the public, nor shall any executive session be used to circumvent or to defeat the purposes of this chapter.
(4) A public body may hold an executive session pursuant to this section for one or more of the following reasons:
(a) Transaction of business and discussion of personnel matters or the character, professional competence, or physical or mental health of a person.
(b) Strategy sessions or negotiations with respect to prospective litigation, litigation or issuance of an appealable order when an open meeting would have a detrimental effect on the litigating position of the public body.
(c) Transaction of business and discussion regarding the report, development or course of action regarding security personnel, plans or devices.
(d) Investigative proceedings by an public body regarding allegations of misconduct or violation of law.
(e) Any body or the Legislature which is meeting on matters within the jurisdiction of such body.
(f) Cases of extraordinary emergency which would pose immediate or irrevocable harm or damage to persons and/or property within the jurisdiction of such public body.

*127 (g) Transaction of business and discussion regarding the prospective purchase, sale or leasing of lands.
(h) Discussions between a school board and individual students who attend a school within the jurisdiction of such school board or the parents or teachers of such students regarding problems of such students or their parents or teachers.
(i) Transaction of business and discussion concerning the preparation of tests for admission to practice in recognized professions.
(j) Transaction of business and discussion or negotiations regarding the location, relocation or expansion of a business or an industry.
(k) Transaction of business and discussions regarding employment and termination of employees. The exemption provided by this paragraph includes the right to hold closed meetings concerning employees as such exemption relates to their deletion from any budget subject to approval of the public body. Final budgetary adoption shall not be taken in executive session.
(5) The total vote on the question of entering into an executive session shall be recorded and spread upon the minutes of such public body.
(6) Any such vote whereby executive session is declared shall be applicable only to that particular meeting on that particular day.

APPENDIX B

In the Chancery Court of the First Judicial District of Hinds County, Mississippi.

COMMON CAUSE OF MISSISSIPPI, et al., Plaintiffs,

HINDS COUNTY BOARD OF SUPERVISORS, et al., Defendants.

No. 118-528.

CONSENT DECREE
This cause having come on to be heard upon announcement by all parties that they have reached a mutually satisfactory settlement of the issues raised in this action which they wish to have embodied in a decree from this Court, and the Court's having reviewed the proposed consent decree and having found that it is just, fair and equitable in all respects, hereby ratifies and adopts said consent decree as a decree of this Court:
IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1.
This Court finds that it has jurisdiction of the parties and the subject matter of this cause.

2.
The defendant Hinds County Board of Supervisors, and its members, ROGER C. STEWART, as President, WALTER L. DENNIS, as Vice President, GEORGE SMITH, PAL R. JONES, and BENNIE THOMPSON, as members of the Hinds County Board of Supervisors, or any committee or subcommittee thereof, and their successors in office are hereby enjoined and prohibited from the following acts or omissions in contravention of the Open Meetings Law, Sections 25-41-1 et seq. Mississippi Code Annotated (Supp. 1981):
1) The Board members are enjoined from entering into executive session without the prior affirmative vote of three-fifths (3/5's) of all members present;
2) The Board members are prohibited from discussing and transacting in closed session business not exempt from open meetings under the provisions of Section 25-41-7(4), more particularly as follows:
a) exempt from open meetings shall be personnel matters or the character, professional competence, or physical or mental health of a person, including employment and termination of employees;
b) exempt from open meetings shall be strategy sessions or negotiations with respect *128 to prospective or ongoing litigation where an open meeting would have a detrimental effect on the litigating position of the Board members. For purposes of this decree, litigation is "prospective" only if an action has been commenced in any court or after receipt by the Board of a formal demand threatening the imminent commencement of an action in any court, or where the Board members are the plaintiffs or moving parties in an imminent action in any court; the provisions of this paragraph shall be construed to protect and implement the attorney-client privilege;
c) exempt from open meetings shall be the transaction of business and discussion regarding the report, development or course of action regarding security personnel, plans or devices;
d) exempt from open meetings shall be investigative proceedings by the Board members regarding allegations of misconduct or violation of law;
e) exempt from open meetings shall be cases of extraordinary emergency which would pose immediate or irrevocable harm or damage to persons and/or property within the jurisdiction of the Board of Supervisors;
f) exempt from open meetings shall be the transaction of business and discussion regarding the prospective purchase, sale, or leasing of lands, in which the parcel(s) of land under consideration is (are) specifically identified;
g) exempt from open meetings shall be transaction of business and discussions regarding the location, relocation or expansion of a business or an industry, where the business or location is specifically identified;
3) The Board members are enjoined from holding executive sessions without stating in open meeting, and recording in the minutes of said meeting, the reasons for said executive session, which shall be one of the exemptions set out hereinbefore in paragraph 2 above; and further provided that in the case of exemption 2(b), if a closed meeting is had to discuss litigation commenced in any court, that action shall be indentified [sic] by court in which filed, style and number of such action and reason shall be given why an open meeting would be detrimental to the litigation position of the Board or its members;
4) At the close, recess or adjournment of any meeting, the time, date and place of the next meeting shall be entered upon the minutes and shall be verbally announced; for any meeting called without such notice, the Board members shall cause the time, date, and place of such meeting to be posted conspicuously at their offices in the First and Second Judicial Districts of Hinds County and mailed to any member of the news media so requesting no later than forty-eight (48) hours prior to such meeting;
5) The Board members are enjoined from entering into executive session without recording the vote, by individual Board member, in the minutes of said meeting;
6) The Board members are enjoined from failing to record in the minutes of all meetings, whether in open or executive session, a record by individual member of any votes taken;
7) The Board members are enjoined from the practice of recessing meetings to avoid the requirements of a vote and the recordation of such a vote in accordance with the Open Meetings Law, or to avoid the requirement that the schedule for reconvening the meetings be made public knowledge;
8) The Hinds County Board of Supervisors are enjoined from holding executive sessions to discuss or vote on such issues, not exempt from the requirements of open meetings as parking spaces, the decision on whether to acquire lands, future banking, matters discussed at an Area Supervisors' meeting, the distribution of federal surplus cheese, or redistricting;
9) The Board members are prohibited from using executive sessions or any means whatsoever to circumvent or defeat the purposes of the Open Meetings Law;
10) In complying with the Open Meetings Law the Board members shall interpret *129 and apply the provision of said law broadly to the effect that the formation and determination of public policy is public business and in order to enhance and encourage maximum public observation and participation in the meetings of the Board, and the exemptions from the Open Meetings Law shall be interpreted and applied narrowly.
SO ORDERED, ADJUDGED AND DECREED this the 10th day of May, 1982.
 /s/ Joe G. Moss
 CHANCELLOR
AGREED:
s/Shirley Payne
ATTORNEY FOR PLAINTIFFS
s/Natie Caraway
ATTORNEY FOR DEFENDANTS
NOTES
[1] Of course, anybody knowing human nature will recognize that merely by going into executive session to discuss some matter will excite the curiosity of whomever is present to know just what it is. The audience may very well get more interested in determining what was discussed in executive session than all the rest of the business discussed at the meeting. That, however, is something the board will have to live with.
[2] The injunction in the consent decree applies not only to current members of the board, but to their successors in office as well.
[3] McKay temporarily replaced supervisor Pal Jones upon his resignation. Jones was later permanently replaced by Wilbourn. See, supra, p. 112.