# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-02032-SCT

*GANNETT RIVER STATES PUBLISHING CORPORATION, INC. d/b/a THE CLARION-LEDGER*

*v.*

*CITY OF JACKSON, HARVEY JOHNSON, IN HIS OFFICIAL CAPACITY AS MAYOR OF THE CITY OF JACKSON; MARGARET BARRETT, IN HER OFFICIAL CAPACITY AS PRESIDENT OF THE JACKSON CITY COUNCIL; AND BEN ALLEN, LESLIE McLEMORE, KENNETH STOKES, WILLIAM "BO" BROWN, C. DARYL NEELY AND ALLEN "CHIP" RENO, JR., IN THEIR OFFICIAL CAPACITY AS MEMBERS OF THE JACKSON CITY COUNCIL*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/18/2002 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | LEONARD D. VAN SLYKE, JR. |
| | LAURA L. GIBBES |
| ATTORNEYS FOR APPELLEES: | RONALD DEWAYNE BAILEY |
| | TERRY WALLACE |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED- 02/26/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**SMITH, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This case involves the interpretation of two important state statutes, the Open Meetings Act, Miss. Code Ann. §§ 25-41-1 to -17 (Rev. 2003), and the Mississippi Public Records Act, Miss. Code Ann.

§§ 25-61-1 to -17 (Rev. 2003). Gannett River States Publishing Corporation, Inc. d/b/a *The Clarion-Ledger* (Gannett), accused the Jackson City Council of denying the public and the press access to a meeting held during regular business hours and refusing to release the minutes of the meeting to the public. The trial court found that the meeting was merely a social gathering and that neither statute was violated. Gannett appeals the ruling on three issues. We hold that the trial court erred in finding that the October 5, 2000, meeting was a social gathering and thus, not subject to the requirements of the Open Meetings Act. We reverse and remand the case to the trial court for further proceedings consistent with this opinion to determine whether the Public Records Act was violated and whether any civil penalties or expenses should be assessed.

### FACTS

¶2. A gathering took place on October 5, 2000; present were the Mayor, six council members, the City Attorney, an Assistant City Attorney, the Chief City Administrator, the Chief of Staff, the City Clerk, and several other city employees. Also present at the event was Claudette Romious, a communications consultant and facilitator. The public was not given notice of the event, but a reporter for *The Clarion-Ledger*, Gregg Mayer, learned of the meeting from a city employee the morning of the meeting. Mayer went to the meeting two hours after it had begun, but he was not allowed to stay and observe.

¶3. Through his employer, *The Clarion-Ledger*, Mayer contacted an attorney, Mark Fijman, who later accompanied Mayer back into the meeting, asking that Mayer be allowed to stay. Fijman informed the city officials that they were in violation of the Open Meetings Act. City officials still refused to allow Mayer to stay in the meeting.

¶4. On November 1, 2000, *The Clarion-Ledger* made a written request to the City of Jackson for the minutes and other information relating to the event of October 5, 2000. On November 8, 2000, the

2

city responded that the event was closed and no minutes were taken because it was not an "official meeting."

¶5.     Gannett filed a complaint against the City of Jackson and the members of the Jackson City Council (City), averring that the Jackson City Council held an "unannounced closed meeting on October 5, 2000," in violation of the Open Meetings Act, Miss. Code Ann. § 25-41-3(a). The complaint was filed on January 31, 2001, in the Hinds County Chancery Court, seeking a permanent injunction requiring the City to comply with the Open Meetings Act, and the Public Records Act. Gannett also sought penalties, reasonable attorney's fees, and expenses associated with bringing suit.

¶6.     The City filed its answer and affirmative defenses to Gannett's complaint, and a motion to dismiss the official capacity defendants. The trial court did not dismiss the official capacity defendants.

¶7.     Depositions were taken of reporter Gregg Mayer, and the seven city council members: Ben Allen, Margaret Barrett, William Brown, Leslie McLemore, Daryl Neely, Chip Reno, and Kenneth Stokes. These depositions were presented and admitted at trial as Exhibit One, which also included the stipulated facts.

¶8.     On September 28, 2001, Gannett filed a motion for summary judgment. The City responded to the motion on October 21, 2001. Gannett replied to the response on the next day. On March 5, 2002, the chancery court denied the summary judgment motion, finding a material issue regarding whether the October 5, 2000, event was an official meeting.

¶9.     The case was tried on November 6, 2002. The City of Jackson maintained that the event was a social gathering and not an official meeting of the city council. The parties stipulated to the basic facts in the case. The only real issue of material fact was the categorization of the gathering that took place on October 5, 2000. After hearing the evidence, the chancellor agreed with the city that the event was a social

3

gathering. On November 18, 2002, the trial court found that the October 5, 2000, event was a social function to which the Open Meetings Act did not apply. The trial court denied all relief requested by Gannett, stating public policy was not offended by the event because no city business was conducted. Gannett filed a motion for clarification of the court's opinion and order dated March 5, 2002, and to amend the order to include certification. The court subsequently denied this motion.

¶10.    Gannett filed an appeal, asking this Court to review three issues.

## STANDARD OF REVIEW

¶11.    While this Court will always review a chancellor's findings of fact, it will not disturb the factual findings of a chancellor when supported by substantial evidence unless the Court can say with reasonable certainty that the chancellor abused his discretion, was manifestly wrong, clearly erroneous or applied an erroneous legal standard. *Morgan v. West*, 812 So.2d 987, 990 (Miss. 2002) (citing *Cummings v. Benderman*, 681 So.2d 97, 100 (Miss. 1996)). When reviewing questions of law, this Court employs a de novo standard of review and will only reverse for an erroneous interpretation or application of the law. *Id.* (citing *Bank of Miss. v. Hollingsworth*, 609 So.2d 422, 424 (Miss. 1992); *Harrison County v. City of Gulfport*, 557 So.2d 780, 784 (Miss. 1990)).

¶12.    In this case, the chancellor found that "the event of October 5, 2000 was not a 'meeting' under the meaning of Miss. Code Ann. § 25-41-1, et seq." Since we review the chancellor's interpretation and application of the law, the de novo standard of review applies.

## DISCUSSION

¶13.    We have interpreted and applied the Open Meetings Act in only three cases; however, the decisions are thorough in their statutory interpretation discussion. Basically, a "public body" holding a "meeting" must make the meeting open to the public unless an "executive session" is called, where the

4

Legislature has defined "public body" and "meeting" and has outlined the procedure for holding an "executive session"in Miss. Code Ann. § 25-41-1, et seq. While we recognize the admirable goal of the Jackson City Council and applaud its efforts to work as a more cohesive unit, we must be mindful that good intentions do not distract us from correctly interpreting the Open Meetings Act or allow us to compromise its narrowly tailored exceptions.

**I. WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE OCTOBER 5, 2000, MEETING OF THE JACKSON CITY COUNCIL WAS NOT SUBJECT TO THE REQUIREMENTS OF THE OPEN MEETINGS ACT, MISS. CODE ANN. § 25-41-1, *ET SEQ;* AND WHETHER THE COURT FURTHER ERRED IN FAILING TO FIND THAT THE MEETING DID NOT COMPLY WITH THE REQUIREMENT THAT THE MEETING BE CONDUCTED IN AN OPEN AND PUBLIC MANNER.**

¶14.    The trial court found that the event on October 5, 2000, was not a meeting but was a purely social gathering and, as such, was not governed by § 25-41-1. The Legislature has defined "meeting" as "an assemblage of members of a public body at which official acts **may** be taken upon a matter over which the public body has supervision, control, jurisdiction or advisory power . . .," where "public body" means "any executive or administrative board, commission, authority, council, department, agency, bureau or any other policy making entity . . . of the state of Mississippi, or any political subdivision or municipal corporation of the . . . which is supported wholly or in part by public funds or expends public funds . . ." Miss. Code Ann. § 25-41-3(a)(i), (b) (emphasis added).

¶15.    There is no dispute that the Jackson City Council is a public body. The six of seven council members who were present at the event composed a public body then that could have taken official acts because a quorum was present. The City argues that since no official acts were taken, the gathering could not have been an official meeting; however, the wording in the statute is "official acts may be taken." The

5

Legislature does not indicate that official acts must be taken in order for the gathering to be considered a meeting.

¶16. Closer examination of our prior interpretation of § 25-41-7(4) shows that "official acts" includes action relating to formation and determination of public policy, but excludes **purely social** functions. *Bd. of Trustees of State Insts. of Higher Learning v. Miss. Publishers Corp.*, 478 So. 2d 269, 278 (Miss. 1985). As outlined by this Court in *Board of Trustees*, the factors to be considered in the determination of whether an activity is business or social within the context of the open meetings requirement include the activity that takes place at the function, the advance call or notice given to the members, an agenda, the claim for per diem and travel expenses by the Board members, and other pertinent factors. *Id*. In *Board of Trustees*, this Court found that a luncheon between the Board and the student body presidents of the colleges and universities was not a purely social affair. This Court said official acts occurred because a written program was distributed and discussions were conducted that pertained to the "formation of public policy." *Id*. This Court also noted that it was unclear in *Board of Trustees*, whether public funds were used to pay for the food service. *Id*. Here, it is clear Council Member Ben Allen ultimately paid the bill, but some members of the council were under the impression the City was going to fund the gathering and Allen did not originally intend to pay the bill.

¶17. In the present case, the activity was the gathering of a quorum of the board members, the mayor, his staff, and city attorney led by a facilitator. The members were given advance call or notice, according to their depositions. The members, including non-attendee Kenneth Stokes, knew of the gathering several weeks in advance, and they were asked to suggest good dates for holding the event. The chancellor found that there was no agenda at the event; however, the evidence indicates otherwise. The facilitator apparently had a plan for how the day would progress according to depositions of William Brown and Daryl Neely.

6

Brown said the facilitator "kind of led the . . . well, she conducted obviously, you know, the seminar or the . . . session." Neely said the facilitator had a "flip chart writing down bullet points, ideas to discuss." According to the American Heritage Dictionary of the English Language, 24 (1981), agenda means a "list of things to be done, especially the program for a meeting," and the facilitator's flip chart is indicative of an agenda.

¶18.    The record does not indicate that any claims for per diem or travel expenses were made; however, since the event was held at the Jackson School District's Environmental Learning Center, it seems unlikely travel expenses would be incurred. There is no indication that the city employees took leave from work; therefore, they were most likely being paid for their work that day. In her deposition, when asked if she attended the retreat as part of her duties with the council, Margaret Barrett responded, "Yes. I would have done this with any group, board, any committee . . . that you are trying to get to know better and work with." Furthermore, the depositions of Brown and Kenneth Stokes, who did not attend the event, indicate that several council members were under the impression that the city was paying the tab for the day's activities. When asked if he was aware of how the facilitator was paid, Brown responded, "Well, she was paid through -- through -- through the council's training budget." When questioned further, Brown said, "Well, that's how we paid the other one . . . ." When Stokes was asked if he knew how the facilitator was paid, he said, "I think they were paid through the -- through the city." In fact, one may infer from the record that Ben Allen only picked up the bill because of the impending lawsuit and legal issues.

¶19.    The depositions also indicate that some written notice was given to those invited to the event. Leslie McLemore, Ben Allen, Chip Reno, and Kenneth Stokes each indicated in their separate depositions that they received some written notice of the scheduled event in advance.

¶20. Additionally, in their depositions, two council members indicated the City Council had attended similar retreats in the past. In reference to a retreat held in about 1998 at Hinds Community College Eagle Ridge Conference Center, Reno stated in his deposition,

> I do know there was some media there. . . . one of the news stations came, and they were not -- they were allowed to take some video of -- B role is what I call it, just around the room while we were talking . . . And they may have gotten a quote or two outside the conference room we were working in at the time.

When William Brown was asked about the prior retreats in his deposition, he stated, "I don't think the public was excluded from none of them." Further Brown stated he didn't recall whether any of the public was in attendance at the Eagle Ridge retreat but that, "we might have had a guest or two come through."

¶21. Also pertinent to the determination of the social or business nature of the event is the fact that no spouses, family members, or friends of the council members or city employees were present or invited. The stated purpose of the function was to improve the ability of those present to work together through learning more about each other.

¶22. In *Hinds County Board of Supervisors v. Common Cause of Mississippi*, 551 So. 2d 107, 123 (Miss. 1989), this Court examined the nature of a function attended by a public board, finding that whether a function was informal or impromptu, it is a "meeting" within the meaning of the Open Meetings Act only when there are to occur deliberative stages of the decision-making process that lead to formation and determination of public policy. Thus, "[a] public board should be available for social functions with charities, industries and businesses, at which no action is taken and **their only function is to listen**, without being subjected to the Act." *Id*. (emphasis added). Clearly, as indicated in the record, the persons present at the October 5, 2000, event were not merely listening to the facilitator; they were interacting with each other and with the facilitator. Had they been only listening, they would not have

8

voiced concerns about the media's or the public's presence hindering their ability to speak freely. According to Barrett's deposition, she thought "there was pretty much agreement we wouldn't be able to discuss openly our personality types and all that with [Mayer] there."

¶23. In *Hinds County Board of Supervisors*, we reaffirmed our decisions in *Mayor & Aldermen of City of Vicksburg v. Vicksburg Printing & Pub. Co.*, 434 So.2d 1333 (Miss. 1983) (*Vicksburg*) and *Board of Trustees*, 478 So.2d 269, regarding the Open Meetings Act. The first of those decisions, *Vicksburg*, was the first time this Court interpreted the Open Meetings Act. In *Vicksburg*, 434 So.2d at 1336, we acknowledged "we live in an age when secrecy in government generates suspicion and mistrust on the part of our citizenry." Noting that the government must have the confidence of the public being served in order to govern effectively, we recognized that though openness may be inconvenient sometimes, "it is the legislatively decreed public policy of this state." *Id*.

¶24. Just two years later, the Open Meetings Act was again before us. In *Board of Trustees*, 478 So.2d at 276, we repeated our holding in *Vicksburg*, stating, "The Open Meetings Act was enacted for the benefit of the public and is to be construed liberally in favor of the public."

¶25. Our opinion in *Hinds County Board of Supervisors*, 551 So. 2d 107, is directly on point in this case, as the following excerpt indicates:

> No doubt there are occasions when board members would speak more frankly on some matter if only the board members were present, and no doubt there are instances in which a board member would personally prefer to speak only to his colleagues. Of far greater importance, however, is that all public business be open to the public. Every member of every public board and commission in this state should always bear in mind that the spirit of the Act is that a citizen spectator, including any representative of the press, has just as much right to attend the meeting and see and hear everything that is going on as has any member of the board or commission. Miss. Code Ann. § 25-41-1; *Mayor & Aldermen of Vicksburg*, supra; *Board of Trustees v. Miss. Publishers Corp.*, supra.

9

> A citizen spectator or news reporter is not a participant. He has no right to intrude or interfere in any manner with the discussion, deliberation or decision-making process. Miss. Code Ann. § 25-41-9; *Wood v. Marston*, 442 So.2d 934, 941 (Fla.1983). But he does have a right enforceable at law to be there and see and hear everything.

Additionally, informal sessions may be considered "meetings" within statutory definition, according to *Board of Trustees*, 478 So. 2d at 278.

¶26. All the deliberative stages of the decision-making process of the public body that lead to formation and determination of public policy are "meetings" within the meaning of Section 25-41-7(4) which requires that all meetings of a public body be public except when in executive session. *Board of Trustees*, 478 So. 2d at 278. While the exceptions to the statute are to be construed narrowly, the statute is to be construed liberally to keep public meetings open. However, as we stated in *Hinds County Board of Supervisors*, "We are not prepared to say that every informal or impromptu meeting which the Board members may attend automatically comes under the purview and mandate of the Act." 551 So. 2d at 122-23. For example, the Jackson City Council might decide to charter a bus to take all of them, but only them, to a college football game out of town. On that trip, the bus driver might ask them when some topic will be heard by the council. A short exchange might follow between the council members before the topic turns to something else. This would be an example of an impromptu meeting that is not covered by the Open Meetings Act.

¶27. The city council should have held the meeting in an open and public manner. If it became apparent that the public needed to be excluded for a legislatively approved reason, the council could have then voted to go into executive session after stating a specific reason. The reason given must be sufficient in specificity to inform those present that there is in reality a specific, discrete matter or area which the public body has determined should be discussed in executive session. *Hinds County Bd. of Supervisors*, 551 So.2d

10

at 110-12. The Legislature has outlined the procedure for holding an executive session in Miss. Code Ann. § 25-41-7(4). This Court has interpreted that statute and has also outlined the procedure for holding an executive session in *Hinds County Board of Supervisors*, 551 So. 2d at 110-12. The council could have entered into executive session by specifically identifying a particular area related to personnel matters, which they wanted to discuss privately. The executive session procedure may be cumbersome, but it can be followed to protect certain private matters when necessary. While the entire retreat may not be deemed a legitimate exception under the Open Meeting Act, certainly portions of the day involving disclosure of personal matters relating to personnel would be covered and could be protected by executive session.

¶28. We find that the trial court did err in its characterization of the event as a purely social gathering. The event was in fact a meeting and should have been conducted as such, following the requirements of the Open Meetings Act for allowing the public access, keeping minutes, and entering an executive session, as needed.

> **II. WHETHER THE TRIAL COURT ERRED IN ITS FINDING THAT THE MINUTES OF THE OCTOBER 5, 2000, MEETING OF THE JACKSON CITY COUNSEL WERE NOT REQUIRED TO BE RECORDED OR PRODUCED FOR PUBLIC INSPECTION PURSUANT TO THE MISSISSIPPI PUBLIC RECORDS ACT, MISS. CODE ANN. § 25-61-1, *ET SEQ*.**

> **III. WHETHER THE TRIAL COURT ERRED IN FAILING TO AWARD CIVIL PENALTIES AND EXPENSES, INCLUDING ATTORNEYS FEES, TO APPELLANT PURSUANT TO MISS. CODE ANN. § 25-1-15.**

¶29. The trial court denied the relief requested concerning these two issues because it found that the event was not a meeting; thus, it concluded these statutes would not apply and no relief would be available to Gannett. The City concedes that if the event was a meeting, the Public Records Act would apply. Both

of these issues rest on the result of the first issue. These issues must first be resolved in the trial court with the understanding that the event was a meeting under the meaning of Miss. Code Ann. § 25-41-1, before we would have anything to review with regard to the trial court's handling of these issues.

## CONCLUSION

¶30.    We hold that the gathering on October 5, 2000, was a meeting and, as such, was governed by Miss. Code Ann. §§ 25-41-1, et seq. and §§ 25-61-1. Therefore, we reverse the judgment of the Hinds County Chancery Court, and we remand the case to the trial court for further proceedings consistent with this opinion.

¶31.    **REVERSED AND REMANDED.**

**PITTMAN, C.J., WALLER, P.J., COBB, CARLSON AND DICKINSON, JJ., CONCUR. DICKINSON, J., CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, C.J., SMITH, COBB AND CARLSON. EASLEY AND GRAVES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**DICKINSON, JUSTICE, CONCURRING:**

¶32.    Although I concur with the result and reasoning set forth by the majority, I am compelled to write separately, for I believe there exist certain principles so essential to a free society that they must be protected from even the slightest erosion or compromise. Of those principles, none is more important or necessary than the right of the citizenry to be fully informed of the deeds, and misdeeds, of those entrusted with public business.

¶33.    It cannot be doubted that the natural tendency of governmental power - at every level - is to proliferate and protect itself and to increase at whatever pace, and to whatever extent, the public will

12

abide.[1]  Nor can it be doubted that the best protection against such governmental excess, and the best assurance of fair, honest, accountable public officials, is the right of the public to be informed as to the acts and actions of those public officials when they discuss, perform and carry out the business of the public.

¶34.    Few citizens have the time and expertise to monitor and investigate the acts of public officials.  For this reason, citizens depend upon the news media to perform these functions and report their findings.  However, they cannot report what they are not allowed to hear.

¶35.    This fundamental concept was not lost on our Legislature which, in response to the public's right to governmental accountability, passed the Open Meetings Act, giving citizens - including members of the press - the right to attend "public body" meetings.  Miss. Code Ann. § 25-41-5 (Rev. 2003).

¶36.    The importance placed by the Legislature on the Open Meetings Act, as well as its stated purpose, is as follows:

> It being essential to the fundamental philosophy of the American constitutional form of representative government and to the maintenance of a democratic society that public business be performed in an open and public manner, and that citizens be advised of and be aware of the performance of public officials and the deliberations and decisions that go into the making of public policy, it is hereby declared to be the policy of the State of Mississippi that the formation and determination of public policy is public business and shall be conducted at open meetings except as otherwise provided herein.

*Id.* § 25-41-1.

¶37.    This clear purpose, together with several previous decisions of this Court, should have served notice on the City of Jackson, its officials, and the trial court that  the October 5, 2000, meeting was within the purview of the Act.

---

[1]An egregious example of this immutable truth occurred only seven years following ratification of the Bill of Rights when, in 1798, Congress passed the Sedition Act which, among other things, made it a criminal act to speak out against the Congress.

¶38.   Two decades ago, this Court was called upon for the first time to interpret the provisions of the Open Meetings Act. Justice James L. Robertson's superb opinion for the Court included the following statement:

> Governmental service ought be noble, if not heroic. Local self-government . . . remains the essence of our democracy. Our legislature has decreed that its acts ought be conceived in the open air. That our statutes may be judged by some to have fallen short of the poet's perfection does not undercut the power of their policy. Openness in government is the public policy of this state.

*Mayor & Aldermen of the City of Vicksburg v. Vicksburg Printing & Pub. Co.*, 434 So. 2d 1333, 1336 (Miss. 1983) (footnote omitted).

¶39.   Additionally, this Court has held that "the Act is to be construed liberally in favor of public access." *Hinds Cty. Bd. of Sup'rs v. Common Cause of Miss.*, 551 So.2d 107, 110 (Miss. 1989) (citing *Bd. of Trustees of State Insts. of Higher Learning v. Miss. Publishers Corp.*, 478 So 2d 269, 276 (Miss. 1985)).

¶40.   This Court has further noted that "[e]very member of every public board and commission in this state should always bear in mind that the spirit of the Act is that a citizen spectator, *including any representative of the press*, has just as much right to attend the meeting and see and hear everything that is going on as has any member of the board or commission." *Hinds Cty. Bd. of Sup'rs,* 551 So. 2d at 110 (emphasis added).

¶41.   The Open Meetings Act specifically prohibits any attempt to use an executive session to "circumvent or defeat the purposes" of the Act. Miss. Code Ann. § 25-41-7 (Rev. 2003). This Court has previously set forth factors to be considered where, as here, public bodies attempt to use a "social function" to circumvent or defeat the purposes of the Act. See *Board of Trustees*, 478 So. 2d at 278, construing

14

Miss. Code Ann. § 25-41-17. The majority provides an excellent analysis of the factors from *Board of Trustees* as applied to the facts here. Upon review of that analysis, I do not find this case at all difficult to decide. The defendants violated the Act when they denied the public and the press access to the meeting and when they refused to release the minutes of the meeting. No doubt, some public bodies in this state, from time to time, may use the labels, "executive session," and "social gathering," in artful attempts to circumvent the clear mandate of the Act. They shouldn't, and they should be on notice that this Court has a duty to ensure that the legislative intent of the Act is followed by rejecting such attempts, creative though they may be. We will.

**PITTMAN, C.J., SMITH, P.J., COBB AND CARLSON, JJ. JOIN THIS OPINION**.